UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

PAMELA WILEY-STIGER,                                          Plaintiff,

v.                                          Civil Action No. 3:14-cv-295-DJH

EDWIN O'BANNON, et al.,                                          Defendants.

* * * * *

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Pamela Wiley-Stiger was an inmate at Louisville Metro Department of Corrections (LMDC) in 2013; Defendant Edwin O'Bannon was an LMDC Corrections officer. (Docket No. 34-1, PageID # 164)  Wiley-Stiger claims that Officer O'Bannon used excessive force with her during a dispute.  (*Id.*)  Wiley-Stiger sued O'Bannon, alleging that O'Bannon's use of excessive force violated her constitutional rights.  (*Id.*)  In addition, Wiley-Stiger alleges state law claims of false arrest, assault, battery, false imprisonment, and conspiracy.  (*Id.*)  In response, O'Bannon has filed a motion for summary judgment.  (D.N. 34)  O'Bannon has also filed a motion in limine to strike Plaintiff's Expert Disclosures.  (D.N. 29)  Because Wiley-Stiger has raised a genuine dispute of material fact with respect to her federal constitutional claims and her state law assault and battery claims, the defendant's motion for summary judgment will be denied in part and granted in part.  For the reasons explained below, Defendant's motion in limine will be denied.

I.      **BACKGROUND**

During at least part of her time at LMDC, Wiley-Stiger had been sleeping in a "boat," which is "essentially a plastic mat[] into which a mattress fits."  (D.N. 34-1, PageID # 164.)  Boats are used when there are not enough bunks for all the inmates.  (*Id.*)  On March 27, 2013,

Officer O'Bannon instructed the inmates in Wiley-Stiger's dorm that all the inmates sleeping in boats were to move into newly emptied bunks, and had until the next meal time to move their belongings, otherwise they would be skipped at meal time and served last.  (*Id*., PageID # 164-65)

Officer O'Bannon returned to the dorm just before meal time and discovered that there were still personal belongings in one of the boats.  (*Id*., PageID # 165)   After O'Bannon threatened to take the items if they were not removed from the boat, Wiley-Stiger retrieved her things from the boat and placed them on her bed.  (*Id*.)   According to O'Bannon's account, Wiley-Stiger was "cursing and causing the other inmates to become agitated" as she moved her belongings.  As a result, O'Bannon "made the decision to remove Plaintiff from the dorm to prevent her from further agitating the other inmates in the dorm."  (*Id*.)

After retrieving the boat and placing it in the hallway, Officer O'Bannon returned to the dorm "where the inmates were now eating" to remove Wiley-Stiger.  (*Id*.)   O'Bannon claims that he asked Wiley-Stiger to stand up and put her hands behind her back.  (*Id*.)  Wiley-Stiger complied and O'Bannon "held onto her hands behind her back so as to safely escort her from the dorm."  (*Id*.)  O'Bannon alleges that as they were walking out of the dorm, another inmate yelled something that upset Wiley-Stiger.  (*Id*.)   As a result, Wiley-Stiger tried to free herself by "bucking and jumping."  (*Id*.)  Officer O'Bannon claims that he did not have the time or ability to call for assistance.  (*Id*.)  According to O'Bannon, "because Plaintiff was jumping in the air trying to free herself . . . he had no choice but to escort her to a nearby table in order to break her fall in half."  (*Id*., PageID # 166)   After Wiley-Stiger landed on the table, O'Bannon then allegedly "slid her to the ground, spilling ice that was on the table in the process."  (*Id*.)  Next, Wiley-Stiger "went limp and refused to cooperate," forcing O'Bannon to grab her jumpsuit and

"guide her out of the dorm." (*Id.*)  O'Bannon claims that as he was escorting her through the doorway, he slipped on some of the spilled ice and "fell with Plaintiff into the hallway." O'Bannon alleges that he "was able to guide Plaintiff enough that she landed in the boat that had previously been placed in the hallway, and he caught himself on the wall." [1] (*Id.*)

Wiley-Stiger has a very different account of the events in question.  She claims that she and another inmate were eating dinner when the other inmate began "commenting on the cross temperament and demeanor" of Officer O'Bannon.  (D.N. 36, PageID # 206)  The other inmate then allegedly "made a comment stating that she knew the individual from whom [O'Bannon] bought marijuana." (*Id.*)  Wiley-Stiger then said that she also knew the individual.  (*Id.*) According to Wiley-Stiger, O'Bannon overheard the conversation and became angry.  (*Id.*, PageID # 206-07)  As a result, he "approached Plaintiff from behind, grabbing her by both arms and twisting them up behind her back, forcing her off her seat." (*Id.*, PageID # 207)  Wiley-Stiger purportedly had preexisting shoulder injuries, and pleaded with O'Bannon to let her arms go.  (*Id.*)  Instead, Wiley-Stiger contends that O'Bannon "slammed her hard upon the table," then forced her up and slammed her onto the concrete floor.  (*Id.*)  O'Bannon then allegedly drug her out into the hallway where he pushed her into the boat that had been placed there earlier.  (*Id.*)

Wiley-Stiger claims that she sustained severe injuries as a result of Officer O'Bannon's excessive force.  (*Id.*)  Specifically, she asserts that her shoulder and chin were injured, and her shoulder eventually required surgery.  (*Id.*)  Wiley-Stiger allegedly sought medical treatment in jail following the incident to address her shoulder pain and injury to her chin.  (D.N. 36, PageID # 207)  After her release from jail, Wiley-Stiger claims she sought "further treatment at the Emergency Room" and from her treating physician.  (*Id.*)  According to Wiley-Stiger, her

---

[1] The defendant submitted footage from a security camera that captured the end of the incident in the hallway, which the Court reviewed *in camera*.  (D.N. 40)

treating physician found that the incident "obviously" exacerbated her pre-existing shoulder injury and she eventually required surgery to address the issue.  (*Id*.)

In response, Officer O'Bannon asserts that this incident did not cause or aggravate her shoulder injury.  (D.N. 37, PageID # 244–45)  Instead, O'Bannon claims that Wiley-Stiger's injury dated "back as far as 2009 and that one doctor had even discussed the likely need for a surgery on that shoulder in the future."  (*Id*.)  O'Bannon also challenges how Wiley-Stiger's treating physician "reached the conclusion that the obvious pre-existing condition was exacerbated by this incident."  (*Id*.)  O'Bannon argues that another doctor "found that there were absolutely no changes in Plaintiff's shoulder since 2009 and the condition could not have been exacerbated by any action of Officer O'Bannon."  (*Id*.)

In response to the incident, O'Bannon filed an Inmate Disciplinary Report, charging Wiley-Stiger with "disruptive behavior, use of abusive language, refusing to follow order, and threatening staff."  (D.N. 34-1, PageID # 166)  A neutral officer investigated and found Wiley-Stiger guilty of the charges.  (*Id*.)  She was sentenced to serve ten days in a single cell.  (*Id*., PageID # 166-67)  Because Wiley-Stiger had nine days left to serve, she spent "the remainder of her time in custody in the single cell."  (*Id*., PageID # 167)

After her release from jail, Wiley-Stiger filed a complaint with Louisville Metro Department of Corrections against Officer O'Bannon.  (D.N. 36-3, PageID # 231)  When an inmate files a grievance with LMDC, he or she files a written complaint, which is then investigated by the Professional Standards Unit of the LMDC.  (D.N. 46, PageID # 335; D.N. 47, PageID # 376)  As part of the investigation into Wiley-Stiger's complaint, the Professional Standards Unit (PSU) interviewed a number of inmates who were present in the dorm and witnessed the incident.  (*Id*.)  Of the seven inmate-witnesses, four agreed with Wiley-Stiger that

4

O'Bannon grabbed Wiley-Stiger's arm before giving her instructions, and they asserted that she complained of shoulder pain.  They also maintained that even though she did not resist O'Bannon, he forced her onto the table and then the ground.  (*Id.*, PageID # 231-33)  The three other inmates who were interviewed claimed that O'Bannon asked Wiley-Stiger to get up, but she refused and resisted, forcing O'Bannon to take appropriate steps in restraining her and removing her from the dorm.  (*Id.*)

During the investigation, neither the plaintiff nor the defendant was given a hearing to address the complaint or an opportunity to participate in the investigation.  (*See* D.N. 46, PageID # 335; D.N. 47, PageID # 376–77)  Following the investigation, the Professional Standards Unit issued a written report detailing their conclusions.  (D.N. 46, PageID # 335; D.N. 47, PageID # 376)  The investigators found "no proof that Inmate Wiley sustained any serious injuries only bumps and bruises."  (*Id.*, PageID # 237)  Additionally, the report stated that "Inmate Wiley should take some responsibility for her actions in this incident. Inmate Wiley admitted she had cursed [Officer] O'Bannon during the beginning of this incident and her behavior was inappropriate." (*Id.*)  However, investigators also concluded that "O'Bannon's actions were not an attempt to defuse the situation, but rather his actions escalated the situation."  (*Id.*)  The investigators wrote, "O'Bannon should have used better judgment when he decided to remove Inmate Wiley from the dorm by himself."  (*Id.*)  They found that his actions violated policy and procedures regarding the use of force and dealing with violent inmates.  (*Id.*, PageID # 237-38)  As a result of the Unit's report, Officer O'Bannon "was disciplined through a written reprimand."  (D.N. 47, PageID # 376)  Neither party was able to appeal the decision.  (D.N. 46, PageID # 335; D.N. 47, PageID # 378)

Following her release from jail, Wiley-Stiger filed the present complaint in Jefferson Circuit Court, which was removed to federal court, alleging that O'Bannon used excessive force and violated her Constitutional rights.[2]  (D.N. 1-3).  Additionally, she claims false arrest, assault, battery, false imprisonment, and conspiracy under Kentucky state law.  (*Id*.)  Wiley-Stiger seeks to recover damages for "all bodily harm, emotional harm, pain and suffering, loss of income, loss of enjoyment of life and another other injuries inflicted by Defendant," as well as punitive damages and "any and all other relief as may be appropriate, including attorney's fees and reasonable costs and expenses."  (*Id*., PageID # 10)  In response, O'Bannon argues that he is entitled to both sovereign immunity and qualified immunity, and then argues that each of Wiley-Stiger's federal and state law claims fail as a matter of law.  (D.N. 34)  In addition, O'Bannon asks the Court to bar Wiley-Stiger from seeking punitive damages.  (*Id*.)

O'Bannon has also filed a motion in limine, asking the Court to strike Wiley-Stiger's expert witness disclosures from the record and prevent her from utilizing expert testimony. (D.N. 29)  O'Bannon argues that the motion should be granted because: (1) Wiley-Stiger failed to provide the experts' written reports as required by Federal Rule of Civil Procedure 26(a)(2)(B); (2) One of the experts would be "presented by deposition, as opposed to appearing live at trial"; and (3) the disclosures were made four days late.  (D.N. 29, PageID # 146-47) Wiley-Stiger contends that: (1) written reports are not required because the experts are treating physicians; (2) the experts would be available to appear at trial; and (3) the defendant has not alleged any prejudice as a result of the delay.  (D.N. 30)

---

[2] Wiley-Stiger's Complaint alleges Constitutional violations pursuant to 42 U.S.C. §§ 1983, 1985, and 1986.  However, her response to Defendant's motion for summary judgment refers to these claims as § 1983 claims and fails to mention § 1985 or § 1986; therefore, the Court will treat Wiley-Stiger's federal Constitutional claims as being made under § 1983, and not §1985 or §1986.

## II.     MOTION FOR SUMMARY JUDGMENT

To grant a motion for summary judgment, the Court must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of identifying the basis for its motion and those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies this burden, the non-moving party must point to specific facts demonstrating a genuine issue of fact.  *Anderson*, 477 U.S. at 247–48 (1986).

In considering a motion for summary judgment, the Court must review the evidence in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), but "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  The non-moving party must present specific facts demonstrating that a genuine issue of fact exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).

### a.   Federal Claims

#### i.   Sovereign Immunity

Wiley-Stiger's federal claims against Officer O'Bannon in his official capacity are considered to be claims against the Louisville Metro Department of Corrections, which are in effect claims against the city.  *Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *Harrison v.*

*Michigan*, 722 F.3d 768, 771 (6th Cir. 2013).   Such claims against the Louisville Metro Government are barred by the Eleventh Amendment because the city "is a political subdivision of the Commonwealth." *Jewish Hosp. Healthcare Servs., Inc. v. Louisville/Jefferson Cty. Metro Gov't*, 270 S.W.3d 904, 907 (Ky. Ct. App. 2008).   The Eleventh Amendment prohibits bringing §1983 claims against a state in federal court, regardless of the relief sought, unless the state has waived its immunity or Congress has overridden it.   *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119-20 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *Ferritto v. Ohio Dep't of Highway Safety*, No. 90-3745, 1991 WL 37824, at *2 (6th Cir. Mar. 19, 1991).   The Commonwealth of Kentucky has not waived its immunity to § 1983 suits, *see Adams v. Morris*, 90 F. App'x 856, 857 (6th Cir. 2004), and in enacting § 1983, Congress did not intend to override the traditional sovereign immunity of the states.   *Whittington v. Milby*, 928 F.2d 188, 193-94 (6th Cir. 1991) (citing *Quern v. Jordan*, 440 U.S. 332, 341 (1979)).   Thus, Officer O'Bannon is entitled to sovereign immunity on the federal claims made against him in his official capacity.

### ii.  Qualified Immunity

"A claim of qualified immunity presents two closely linked questions: whether the defendant violated the plaintiff's rights and whether those rights were clearly established at the time of the alleged violation." *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Saucier v. Katz,* 533 U.S. 194 (2001)).   In this case, Wiley-Stiger argues that Officer O'Bannon violated her constitutional right not to be subjected to excessive force.   Both parties assumed that the Fourth Amendment applies to Wiley-Stiger's claim of excessive force; however, "for a plaintiff who was a convicted prisoner at the time of the incident, the Eighth Amendment sets the

standard for an excessive force claim." *Id*.  Therefore, because Wiley-Stiger was an inmate at the LMDC facility when the incident occurred, the Eighth Amendment applies to her claim of excessive force.[3]  According to the Supreme Court,  "whenever prison officials stand accused of using excessive physical force" under the Eighth Amendment, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 321–22 (1986)).

### 1.  LMDC Investigation of Wiley-Stiger's Complaint is Not Entitled to Preclusive Effect

In its investigation of Wiley-Stiger's complaint, the Professional Standards Unit explicitly concluded that "O'Bannon's actions were not an attempt to defuse the situation, but rather his actions escalated the situation."  (D.N. 36-3, PageID # 237)  Therefore, if this finding is given preclusive effect, Officer O'Bannon's actions cannot be considered "a good-faith effort

---

[3] While neither party characterizes her status or cites the reason for her incarceration, the Court assumes that Wiley-Stiger was a post-conviction inmate because both sides refer to her as an "inmate" and reference a date certain for her release.  (D.N. 34-1, PageID # 167)  However, even if she were a pretrial detainee, the analysis would be essentially the same.  Excessive force claims made by pretrial detainees are "governed by the Fourteenth Amendment's due process clause." *Ayala–Rosales v. Teal*, No. 15-6196, 2016 WL 4487999, at *2 (6th Cir. Aug. 26, 2016) (citing *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015)).  Pursuant to the Fourteenth Amendment, Wiley-Stiger would have to "show only that the force purposely or knowingly used against [her] was objectively unreasonable." *Id*.  The Supreme Court has held that the following factors should be considered in determining the reasonableness of the force used: (1) "the relationship between the need for the use of force and the amount of force used"; (2) the extent of the plaintiff's injury; (3) "any effort made by the officer to temper or to limit the amount of force"; (4) "the severity of the security problem at issue"; (5) "the threat reasonably perceived by the officer"; and (6) "whether the plaintiff was actively resisting." *Kingsley*, 135 S. Ct. at 2473 (citing *Graham*, 490 U.S. at 396).  These factors track those considered for an excessive force claim pursuant to the Eighth Amendment. *Whitley*, 475 U.S. at 320–21.

to maintain or restore discipline," and thus violated Wiley-Stiger's constitutional rights under the Eighth Amendment. *Hudson*, 503 U.S. at 6–7 (citing *Whitley*, 475 U.S. at 321–22).

The Supreme Court has held that "federal courts must give a state agency's factfinding 'the same preclusive effect to which it would be entitled in the State's courts' as long as the state agency was acting in a judicial capacity, resolved disputed facts that were properly before it, and the parties had an adequate opportunity to litigate." *Kindle v. City of Jeffersontown*, No. 3:07-CV-158-S, 2013 WL 5425152, at *6 (W.D. Ky. Sept. 26, 2013) (citing *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986)), *aff'd sub nom. Kindle v. City of Jeffersontown, Ky.*, 589 F. App'x 747 (6th Cir. 2014). "In Kentucky, administrative decisions by state agencies acting in a judicial capacity are entitled to the same preclusive effect as judgments of courts." *Columbia Gas Transmission, LLC v. The Raven Co.*, No. CIV. 12-72-ART, 2014 WL 2711943, at *3 (E.D. Ky. June 13, 2014). "A state agency 'acts in a judicial capacity when it hears evidence, gives the parties an opportunity to brief and argue their versions of the facts, and gives the parties an opportunity to seek court review of any adverse findings.'" *Id.* (citing *Peterson v. Johnson,* 714 F.3d 905, 912 (6th Cir. 2013)).

Both parties argue that the LMDC Professional Standards Unit was not acting in a judicial capacity when it investigated Wiley-Stiger's claim and issued its written report. (*See* D.N. 46; D.N. 47) Once an inmate files a complaint, the Professional Standards Unit conducts its own investigation and then issues a written report detailing its findings. (*See* D.N. 46, PageID # 335; D.N. 47, PageID # 376–77) While the Unit interviewed a number of witnesses, it did not provide the plaintiff or defendant with an opportunity to introduce evidence, present their version of the facts outside of the initial complaint, conduct a hearing, or appeal the PSU's findings. (*See id.*) Because neither party was given these opportunities, the Court concludes that the

10

LMDC Professional Standards Unit was not acting in a judicial capacity.  Therefore, the Unit's conclusions are not entitled to preclusive effect.

## 2.  Excessive Force Analysis

The Supreme Court has explained that not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* at 9–10 (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d. Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights")).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* (citing *Whitley,* 475 U.S. at 327).  "Where a prison security measure is undertaken to resolve a disturbance," the following factors are to be considered in determining whether officers acted maliciously: (1) the need for force; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates"; and (5) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 320–21.

Officer O'Bannon's version of events asserts that Wiley-Stiger had been yelling, cursing, and inciting other inmates, and therefore, needed to be removed from the dorm.  (D.N. 34-1, PageID # 165)  O'Bannon contends that Wiley-Stiger began "bucking and jumping" when he attempted to remove her, giving him no choice but to use force to subdue her.  (*Id.*) O'Bannon maintains that he used the amount of force necessary to subdue Wiley-Stiger, and "acted reasonably in order to remove the source of agitation and tension within the dorm in order to prevent further chaos." (*See id.*, PageID # 165, 169–70, 174–75)

According to Wiley-Stiger, she was sitting peacefully and chatting with another inmate when Officer O'Bannon allegedly assaulted her.  (D.N. 36, PageID # 206)  Thus, she argues, there was no need for force.   Under Wiley-Stiger's version, by using unnecessary force, O'Bannon was not attempting to maintain or restore order.   *See, e.g.*,  *Roberson v. Torres*, 770 F.3d 398, 406 (6th Cir. 2014) (Spraying a sleeping inmate in the face with a chemical agent constituted excessive force because it was not necessary to restore order and a "less intrusive means" could have been used to wake the inmate); *Al-Bari v. Guider*, No. 96-6707, 1998 WL 80173, at *3 (6th Cir.  Feb. 19, 1998) ("According to plaintiff's pro se complaint, . . . defendant used force to inflict pain on plaintiff, not to maintain or restore order. . . . [W]e conclude that the alleged conduct supports a claim of an unnecessary and wanton infliction of pain in violation of the Eighth Amendment.").  Wiley-Stiger's account is supported by the PSU's investigation of her complaint, which specifically found that "O'Bannon's actions were not an attempt to defuse the situation, but rather his actions escalated the situation."   (D.N. 36-3, PageID # 237) Therefore, Wiley-Stiger's account supports a claim that force was not "applied in a good-faith effort to maintain or restore discipline," but rather was applied "maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7.

However, even taking Wiley-Stiger's account as true, there is an argument that the physical force used by O'Bannon was *de minimis*. *See, e.g.*, *Leary v. Livingston Cty*., 528 F.3d 438, 443 (6th Cir. 2008) ("Karate chop" to the back of the neck that did not result in injury was *de minimis*); *Gordon v. Joyner*, No. 3:08cv-P667-H, 2010 WL 3001967, at *6 (W.D. Ky. July 28, 2010) (Finding that a punch to the chest while Plaintiff was in handcuffs caused *de minimis* injury, and thus, the officer did not act "maliciously or sadistically to cause harm.").  While a *de minimis* injury is not dipositive, it is one factor to consider in determining whether an officer

acted maliciously.  *See Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).  The PSU investigation found that Wiley-Stiger did not sustain "any serious injuries only bumps and bruises" (D.N. 36-3, PageID # 237), which would likely be considered a *de minimis* injury.  *See, e.g.*, *Richmond v. Settles*, No. 09-6285, 2011 WL 6005197, at *5 (6th Cir. Dec. 2, 2011) (Inmate's "injury report as well as his district court pleadings, however, reflect that he suffered no more than de minimis physical injuries—injuries that did not require any medical treatment after the initial evaluation."); *Jarriett v. Wilson,* 162 F. App'x 394, 400–01 (6th Cir. 2005); *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir. 1997).  Additionally, O'Bannon provides that Dr. Michael Moskal "found that there were absolutely no changes in Plaintiff's shoulder since 2009 and the condition could not have been exacerbated by any action of Officer O'Bannon."  (*Id.*)

Wiley-Stiger, on the other hand, asserts that she sought medical treatment for her injured shoulder while in jail, at an Emergency Room, and from a treating physician.  (D.N. 36, PageID # 207–08)  In addition, her treating physician concluded that the incident exacerbated her pre-existing injury, which ultimately required surgery.  (*Id.*)  Therefore, the injury would not be *de minimis* because it required ongoing treatment, and eventually surgery to address the issue. *See Richmond*, 2011 WL 6005197, at *5.

Finally, O'Bannon's account of events provides that he attempted to temper the severity of the forceful response by first asking Wiley-Stiger to stand and walk out of the room, and only using force when Wiley-Stiger became violent.  (D.N. 34-1, PageID # 165–66)  In response, Wiley-Stiger claims that O'Bannon did not ask her to stand and unnecessarily forced her to the table and then the ground.  (D.N. 36, PageID # 207)  Perhaps most notably, an LMDC investigation found that Officer O'Bannon violated the LMDC policies and procedures regarding use of force when he attempted to remove Wiley-Stiger from the dorm by himself.  (D.N. 36-3,

13

PageID # 237)   O'Bannon was issued a written reprimand for "failing to notify his supervisor and request assistance prior to attempting to remove" Wiley-Stiger.  (D.N. 47, PageID # 376)

Viewing the evidence in the light most favorable to Wiley-Stiger, *Matsushita*, 475 U.S. at 586, the Court concludes that Wiley-Stiger has met her burden of demonstrating a genuine dispute of material fact.  *See Whitley*, 475 U.S. at 320–21.  Wiley-Stiger and Officer O'Bannon have presented two very different accounts of the incident, and both point to specific facts to support their respective accounts.  The Court will not weigh this evidence. *Anderson*, 477 U.S. at 249.  The differences between these two versions lead to different conclusions regarding the "core judicial inquiry" about whether Officer O'Bannon used force "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 6–7.  Therefore, these differences create a genuine dispute of material fact regarding whether O'Bannon violated Wiley-Stiger's Eighth Amendment rights by using excessive force.

### 3.   Whether Right Was Clearly Established

While the plaintiff has presented a genuine dispute of material fact regarding whether the defendant violated her constitutional rights, those rights must have been "clearly established at the time of the alleged violation."  *Phelps*, 286 F.3d at 299 (citing *Saucier,* 533 U.S. 194).  "For a right to be clearly established, 'the right's contours [need to be] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Cordell v. McKinney*, 759 F.3d 573, 587 (6th Cir. 2014) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).

"The right to be free from excessive force is clearly established," however, "whether we grant qualified immunity in a particular case depends upon whether the officer did, in fact, use excessive force."  *Kostrzewa v. City of Troy*, 247 F.3d 633, 642 (6th Cir. 2001).  For the reasons

explained above, Wiley-Stiger has raised a genuine dispute of material fact regarding whether Officer O'Bannon used excessive force against her.   Therefore, the Court cannot grant O'Bannon's motion for summary judgment "on the basis of qualified immunity because it is not clear that a reasonable officer in the defendants' situation would not have known that engaging in the conduct alleged by plaintiff was violative of plaintiff's clearly established right to be free from excessive force." *Id.*

### b.  State Law Claims

#### i.  Sovereign Immunity

Like Wiley-Stiger's federal claims, her state law claims against Officer O'Bannon in his official capacity are considered to be claims against the state.  *Yanero v. Davis*, 65 S.W.3d 510, 518 (Ky. 2001).  "It is an inherent attribute of a sovereign state that precludes the maintaining of any suit against the state unless the state has given its consent or otherwise waived its immunity." *Id.* at 517.  The Commonwealth of Kentucky has not waived its immunity for tort claims.  *Calvert Invs., Inc. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 805 S.W.2d 133, 139 (Ky. 1991).  Therefore, the motion for summary judgment will be granted with respect to Wiley-Stiger's claims of false arrest, assault, battery, false imprisonment, and conspiracy made against Officer O'Bannon in his official capacity.

#### ii.  Qualified Immunity

While O'Bannon is immune from claims made against him in his official capacity, "public employees, while acting in their individual capacities, do not share the immunity of the governmental unit for which they work." *Commonwealth of Ky. Bd. Of Claims v. Harris*, 59 S.W.3d 896, 898–99 (Ky. 2001).  Specifically, "jailers and deputy jailers can be sued for their tortious acts or omissions occurring within the scope of their employment." *Id.* at 899 (citing

*Sudderth v. White,* Ky. Ct. App., 621 S.W.2d 33 (1981)).  Nevertheless, Officer O'Bannon may be entitled to "qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero*, 65 S.W.3d at 522. "Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of the employee's authority." *Id.*  However, if "a public employee violated a constitutional, statutory, or other clearly established right of which a reasonable person would have known or if the public employee 'willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive'" then he acted in bad faith and is not entitled to qualified official immunity. *Woosley v. City of Paris*, 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008).

Officer O'Bannon asserts that he is entitled to qualified official immunity because he was performing a discretionary act, that required him to "use[] his judgment based on his training and experience" to determine the best method for handling Wiley-Stiger.  (D.N. 34-1, PageID # 171) O'Bannon alleges that he made a split-second decision that he could peacefully remove her on his own, and this decision was made in good faith and within the scope of his employment.  (*Id.*, PageID # 171–72)  In response, Wiley-Stiger argues that the defendant is not entitled to qualified immunity because there is an allegation of a constitutional violation.  (D.N. 36, PageID # 209–10)  As explained above, there is a genuine dispute of material fact with respect to whether Officer O'Bannon committed a constitutional violation by using excessive force against Wiley-Stiger.  As a result, there is a genuine dispute as to whether O'Bannon acted with bad faith. Therefore, the Court will not grant O'Bannon's motion for summary judgment with respect to the state law claims made against him in his individual capacity on the basis of qualified immunity. *See Woosley*, 591 F. Supp. 2d at 922.

### iii.  Assault and Battery

"Assault is a tort which merely requires the threat of unwanted touching of the victim, while battery requires an actual unwanted touching."  *West v. City of Paris, Ky*., No. 13-CV-193-JMH, 2015 WL 278142, at *6 (E.D. Ky. Jan. 22, 2015) (citing *Banks v. Fritsch,* 39 S.W.3d 474, 480 (Ky. Ct. App. 2001)).  An officer can be held liable for assault and battery under Kentucky law if he used excessive force against the claimant.  *Id*. (citing *Lawson v. Burnett,* 471 S.W.2d 726, 728–29 (Ky. 1971)).  Because Wiley-Stiger's assault and battery claims hinge on whether Officer O'Bannon used excessive force, and as described above, there is a genuine dispute of material fact regarding that issue, the motion for summary judgment will be denied with respect to Plaintiff's claims of assault and battery made against the defendant in his individual capacity.

### iv.  False Arrest and False Imprisonment

"Although both the terms 'false arrest' and 'false imprisonment' are used in Kentucky case law, the Kentucky Supreme Court has determined that it considers the two to be different names for the same basic tort and that the proper name for the tort is 'false imprisonment.'" *Tunne v. Paducah Police Dep't*, No. 5:08-CV-00188-JHM, 2011 WL 1810521, at *5 (W.D. Ky. May 11, 2011) (quoting *Brewer v. Rogers,* No. 08-23-JBC, 2009 WL 2242389, at *1 (E.D. Ky. July 24, 2009)).  Therefore, while Wiley-Stiger alleges both false arrest and false imprisonment, the Court will analyze these torts as a single false imprisonment claim.

Under Kentucky law, "false imprisonment is the intentional, unlawful detention or restraint of the person or property of another without consent."  11 Ky. Prac. Civ. Proc. Forms § 18:1 (citing *Dunn v. Felty*, 226 S.W.3d 68 (Ky. 2007)).  Wiley-Stiger argues that she was falsely imprisoned when she was placed in a single cell following her dispute with Officer O'Bannon. (D.N. 36, PageID # 212)  However, because Wiley-Stiger was lawfully imprisoned at the time of

17

the incident, the Court will treat Wiley-Stiger's complaint as a challenge to her conditions of confinement.   "With respect to challenges to the conditions of incarceration, the Eighth Amendment is violated only when a prisoner is deprived of the 'minimal civilized measure of life's necessities.'"   *Carlyle v. Aubrey*, 189 F. Supp. 2d 660, 664 (W.D. Ky. 2001) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)).   Additionally, "conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment."   *Rhodes*, 452 U.S. at  347.

Wiley-Stiger has not alleged such conditions.   In response to a complaint filed by Officer O'Bannon against Wiley-Stiger, an Inmate Disciplinary Report ordered Wiley-Stiger to spend ten days in "disciplinary segregation" as punishment for her behavior during the incident.   (D.N. 34-1, PageID # 166; D.N. 34-4, PageID # 195)   As a result, Wiley-Stiger "spent the remainder of her time in custody in the single cell, for a total of nine days."   (D.N. 34-1, PageID # 178)   In support of her claims, Wiley-Stiger simply states that "Officer O'Bannon restrained Defendant and placed her against her will in a solitary holding cell without reasonable grounds and with excessive force."   (D.N. 36, PageID # 212)   Even assuming that is true, these assertions are not sufficient to support a challenge to the conditions of her confinement.   She has not alleged that she was deprived of food, water, medical care, or any other basic necessity. *See Rhodes*, 452 U.S. at 458.   In addition, other than the claim of excessive force relating to the specific incident with Officer O'Bannon, which has already been addressed, Wiley-Stiger has not alleged that she was subjected to any pain as a result of her confinement for nine days in the single cell.   *See id*. at 347.   Therefore, because there is not a genuine dispute of material fact over Wiley-Stiger's claim of false imprisonment, the defendant's motion for summary judgment will be granted with respect to this claim.

### v. Conspiracy

In her complaint, Wiley-Stiger also raises a conspiracy claim.  (*See* D.N. 1-3)  However, Wiley-Stiger did not identify any conspirators or an alleged agreement between conspirators.  (*Id.*)   In addition, Wiley-Stiger did not address her conspiracy claim in her response to O'Bannon's motion for summary judgment.  (*See* D.N. 36)  Furthermore, from a review of the record, no such claim presents itself.  *See FTC v. E.M.A., Inc.*, 767 F.3d 611, 630 (6th Cir. 2014) ("[E]ven where a motion for summary judgment is unopposed, a district court must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists.").  Therefore, there is no genuine dispute of material fact, and the motion for summary judgment will be granted with respect to the conspiracy claim.

### C.  Punitive Damages

The Supreme Court has held that for cases brought under § 1983, "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages."  *Smith v. Wade*, 461 U.S. 30, 51 (1983).  As discussed above, there is a genuine dispute of material fact with respect to whether Officer O'Bannon used excessive force against Wiley-Stiger, and thus, violated her Eighth Amendment rights.  Because the "core judicial inquiry" for determining if an Eighth Amendment violation has occurred is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," if O'Bannon is found to have violated the Eighth Amendment, then a reasonable jury could conclude that he also recklessly and callously disregarded Wiley-Stiger's rights.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Therefore, the defendant's motion for summary judgment will be denied with respect to punitive damages.

### III.   MOTION IN LIMINE

Officer O'Bannon has also filed a motion in limine, requesting that the Court strike Wiley-Stiger's expert witness disclosures from the record and prevent her from utilizing expert testimony.  (D.N. 29)  O'Bannon first argues that "Plaintiff failed to provide a written report by either witness as required by Federal Rule of Civil Procedure 26(a)(2)(B).  (*Id.*, PageID # 146)  Rule 26 provides that expert disclosures "must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."   However, this report requirement does not always extend to treating physicians.  Fed. R. Civ. P. 26 advisory committee's note to 1993 Amendments  ("A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report."); *see also Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 871 (6th Cir. 2007) ("[A] report is not required when a treating physician testifies within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment.")   Therefore, because the two experts named in Wiley-Stiger's expert disclosure were her treating physicians (D.N. 28), they did not need to provide a written report.  Fed. R. Civ. P. 26; *see also Fielden*, 482 F.3d at 871.

O'Bannon next asserts that one of the experts would be "presented by deposition, as opposed to appearing live at trial."  (D.N. 29, PageID # 147)  However, the plaintiff contends that "Plaintiff's expert disclosure mentions, in passing, that Plaintiff would prefer to present testimony of Dr. Khalily by deposition."  (D.N. 30, PageID # 150)  Plaintiff explains that they made the statement because they assumed "that both parties would prefer to present expert testimony by deposition, and would reach a common understanding and stipulation, a common

practice." (*Id.*)   However, they offer that "if necessary, Plaintiff will present live expert testimony at trial and nothing in her deposition indicates a refusal to do otherwise." (*Id.*)   This contention is not at issue.

Finally, O'Bannon argues that the disclosures were due on October 1, 2015 but were not filed by Wiley-Stiger until October 5, 2015.  (D.N. 29, PageID # 147)  However, O'Bannon does not argue prejudice as a result of the brief delay.  Because striking Plaintiff's expert witness disclosure and preventing Plaintiff from utilizing expert testimony is a high price to pay for a minor delay that caused no prejudice to the defendant, the motion in limine is denied.

## IV.   CONCLUSION

For the reasons explained above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)   Defendant's Motion for Summary Judgment (D.N. 34) is **GRANTED in part and DENIED in part**.   Plaintiff's claims against O'Bannon in his official capacity are **DISMISSED** with prejudice. Plaintiff's claims of conspiracy and false arrest and false imprisonment are also **DISMISSED** with prejudice.

(2)   Defendant's Motion in Limine (D.N. 29) is **DENIED**.

(3)   Pursuant to 28 U.S.C. 636(b)(1)(A), this matter is hereby referred to U.S. Magistrate Judge Colin Lindsay, for resolution of all litigation planning issues, entry of scheduling orders, consideration of amendments thereto, and resolution of all non-dispositive matters, including discovery issues.  Judge Lindsay is further authorized to conduct a settlement conference in this matter at any time.